UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

       -against-

ALBERTO PENA,

              Defendant.

15 Cr. 551 (AJN)

**EMERGENCY MOTION FOR COMPASSIONATE RELEASE
UNDER 18 U.S.C. § 3582(c)(1)(A)**

SHER TREMONTE LLP
Michael Tremonte
Noam Biale
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Email: mtretmonte@shertremonte.com

*Attorneys for Alberto Pena*

## <u>TABLE OF CONTENTS</u>

Page

EMERGENCY MOTION FOR COMPASSIONATE RELEASE.................................................. 1

I.      Procedural History ......................................................................................................... 3

II.     Mr. Pena's Current Conditions of Confinement and Health Conditions ........................... 6

    A.   Conditions of Confinement at FCI Fort Dix .................................................... 6

    B.   Mr. Pena's Particular Health Conditions Make Him Especially Susceptible
      to COVID-19 ...................................................................................................... 10

III.    Under the First Step Act, this Court Has Broad Authority to Determine Whether
    Extraordinary and Compelling Circumstances Exist to Modify Mr. Pena's Sentence and
    Release Him to Home Confinement Now ........................................................................ 13

    A.      The unprecedented nature of this emergency compels the Court to waive the
      exhaustion requirement ..................................................................................... 15

    B.      "Extraordinary and compelling reasons" warrant a reduction of Mr. Pena's
      sentence .............................................................................................................. 19

IV.     Should the Court Deny Compassionate Release, the Court Should Issue a Judicial
    Recommendation That the BOP Re-Designate Mr. Pena's Sentence to Be Served on
    Home Confinement .......................................................................................................... 27

    CONCLUSION ................................................................................................................ 31

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE

Alberto Pena, by and through his undersigned counsel, respectfully moves the Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to modify his 84-month sentence and immediately release him to an extended period of home confinement, followed by supervised release.

Mr. Pena pled guilty to Hobbs Act robbery before Your Honor on February 23, 2016.  He self-surrendered to the Bureau of Prisons ("BOP") on March 1, 2016, and was housed at the Metropolitan Detention Center ("MDC").  On April 17, 2017, this Court sentenced Mr. Pena to a below-Guidelines sentence of 84 months' incarceration, followed by three years' supervised release.  The sentence reflected the Court's careful balancing of the very serious nature of the crime – a violent robbery that Mr. Pena organized (though did not physically participate in) – with the unique and compelling mitigating factors – this was Mr. Pena's first serious criminal offense, committed when he was in his fifties, and was a sharp break from his otherwise good character likely attributable to his ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Mr. Pena was subsequently transferred to FCI Fort Dix, where he is currently housed in the low security facility.  His projected release date, according to the BOP website, is in February 2022; however, it is likely that Mr. Pena will be transferred to home confinement at least six months before then, in August 2021.  Accordingly, Mr. Pena has served more than 2/3 of his sentence and has approximately 16 months left to serve before he would be transferred to home confinement under normal conditions.

Yet current conditions are anything but normal.  There has been an unprecedented change of circumstances that could not have been foreseen at the time of sentencing.  The COVID-19 pandemic, as well as the dangerous conditions for its spread within prisons, now pose an extraordinary and perhaps lethal risk to Mr. Pena's health.  Public health experts unanimously agree that the virus thrives in densely packed populations and is especially aggravated in

unsanitary conditions where people are unable to practice social distancing and proper hand-washing and sanitizing.  In the short time since reporting its first COVID-19 infection, the BOP has seen an explosion of cases among inmates and staff, including at FCI Fort Dix, which currently has at least 30 cases (based on the numbers publicly released by the BOP).

Mr. Pena, who is now 60 years old, is especially vulnerable to the deadly risks of COVID-19 because he suffers from ████████████████████, conditions that scientific studies have indicated increase the risk of infection and worsen outcomes if he were to contract the virus.  In short, the conditions of confinement at FCI Fort Dix significantly exacerbate the likelihood that Mr. Pena will contract COVID-19, which, given his vulnerability, may prove fatal.

These changed circumstances, combined with Mr. Pena's rehabilitation and dramatically improved psychological health, are "extraordinary and compelling" so as to warrant compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) and modification of Mr. Pena's original sentence.  Indeed, the changed circumstances materially alter the balance of the 18 U.S.C. § 3553(a) factors, which this Court is to consider anew in the context of an application for compassionate release.  While Mr. Pena's crime remains as serious as the Court deemed it in 2017, keeping him in prison in conditions that jeopardize his life is a punishment this Court never intended to impose, and is far "greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).  Allowing Mr. Pena to finish out his sentence at home is the prudent and humane response to the risks created by the novel coronavirus.

In the alternative, we respectfully request that the Court recommend to the BOP that it designate Mr. Pena to serve a portion of his sentence as home confinement, pursuant to 18 U.S.C. § 3621, newly-enacted authority pursuant to the CARES Act, and recent guidance from Attorney General William P. Barr.

Attached for the Court's consideration in connection with this motion are: Mr. Pena's BOP Disciplinary Record (Exhibit A); Mr. Pena's BOP medical records (Exhibit B); our request for release for Mr. Pena, sent to the warden of FCI Fort Dix on April 21, 2020 (Exhibit C); an expert affidavit of Dr. Brie Williams that generally addresses the increased public health risks from keeping at-risk inmates incarcerated during the pandemic (Exhibit D); and a letter from Mr. Pena's wife describing his re-entry plan if he were to be released (Exhibit E).

## I.  Procedural History

Mr. Pena was indicted on August 17, 2015 on one count of Hobbs Act robbery, 18 U.S.C. § 1951, and one count of brandishing a firearm in connection with a crime of violence, 18 U.S.C. § 924(c). Dkt. # 1. Mr. Pena was released on a $100,000 personal recognizance bond with conditions of home detention and electronic monitoring. Minute Entry, dated Aug. 18, 2015. Mr. Pena spent seven months of his pretrial release on home detention. He had no issues whatsoever on home detention and was generally compliant with the terms of his pretrial release.[1]

On February 23, 2016, Mr. Pena pleaded guilty to Hobbs Act robbery (the § 924 count and a subsequently-added Hobbs Act conspiracy count were dismissed). Although subject to mandatory remand under 18 U.S.C. § 3143(a)(2), Mr. Pena made a request for a week to surrender to BOP custody, which the government did not oppose and this Court granted. Mr. Pena surrendered on March 1, 2016 and was detained at the Metropolitan Detention Center ("MDC"). While at the MDC, Mr. Pena suffered a significant degradation of his mental health. Mr. Pena had previously been treated for ███████████████ following his experience of complicated grief stemming from the sudden and violent death of his son. While he had

---

[1]     The government at one point during the case sought revocation of bail based on Mr. Pena's contact with a witness, after Mr. Pena approached a long-time friend who was a brother of one of the victims. As was explained at the time, Mr. Pena's actions were taken at the direction of counsel. The Court continued bail with a clarification that any contact with witnesses should be through counsel or an investigator.

obtained effective treatment, including medication, during his pretrial release, his transition to detention caused a lapse in his treatment.  Mr. Pena's mental condition became so severe that the Court ordered a competency hearing.  Minute Entry dated Nov. 30, 2016.  With an adjustment in his medication, Mr. Pena's condition improved and on January 3, 2017, the Court found him to be competent at the time he entered his guilty plea and able to proceed to sentencing.  Minute Entry, dated Jan. 3, 2017; Dkt. # 244.

Sentencing was held on April 17, 2017.  At sentencing, the Court noted the seriousness of the offense and its traumatic impact on the family that was robbed.  Sentencing Tr. 43:8-22. Though Mr. Pena was an organizer of the robbery, "he did not physically participate," a fact the Court considered to be "important . . . , particularly when coupled with his lack of criminal history or use of violence in the past."  *Id.* at 44:22-23.  The Court noted the apparent "psychosocial impact" of the many traumas Mr. Pena experienced throughout his life, and stated, "no doubt his serious depression and substance abuse played a part in his involvement in this crime."  *Id.* at 45:10-12.  The Court also noted, "the criminal conduct certainly appears a departure from his otherwise nonviolent and productive life."  *Id.* at 45:13-14.  Those factors, and Mr. Pena's connection to this family and community suggested, in the Court's view, "a very decreased likelihood of recidivism going forward."  *Id.* at 45:18-19.  Mr. Pena's age also "factor[ed] into [the] decreased likelihood of recidivism."  *Id.* at 46:7-8.

Following sentencing, Mr. Pena was transferred from the MDC to FCI Fort Dix, where he has been incarcerated in the low security facility since.  He has used his time in prison productively.  He works in the food services unit of the prison and regularly attends church services.  He has completed numerous programs, including a 40-hour drug rehabilitation program, a 12-hour drug program, a "Money Smart" course, an English as a Second Language course, and a parenting course.  Mr. Pena has not had a single disciplinary infraction during his

time in BOP facilities.  *See* Disciplinary Record, attached hereto as Exhibit A.  He continues to take multiple medications for ███████████████ , as well as for ██████████████ ███████████ , discussed more fully below.  *See* Medical Records, attached hereto as Exhibit B, at 373-75, 410.  Both he and his family report that Mr. Pena's mental health has dramatically improved as his medications have been stabilized, he has adjusted to prison life, and has begun to look forward to his release.  According to the BOP website, Mr. Pena is scheduled for release on February 15, 2022; however, based on the BOP's authority to transfer inmates to home confinement for the final period of their sentence, it is likely that he will be released at least six months earlier, in August 2021.[2]

On April 21, 2020, the undersigned contacted the warden at FCI Fort Dix to request that Mr. Pena be released pursuant to the compassionate release statute or, in the alternative, for release to home confinement pursuant to Attorney General William Barr's memorandum of March 26, 2020, authorizing the BOP to "prioritize the use of your various statutory authorities to grant home confinement."[3]  *See* Letter dated Apr. 21, 2020, attached hereto as Exhibit C.  On April 22, we received an email from the facility's administrative assistant acknowledging receipt of our request and seeking additional information on the basis for compassionate release, which we provided by email dated April 23, 2020.  We wrote to the administrative assistant to follow up on Mr. Pena's request on April 27, 2020, but have yet to receive any response.

---

[2]     To the extent Mr. Pena is deemed to be eligible for the RDAP program or the expanded criteria for home confinement under the First Step Act, his release to home confinement or to a residential treatment program could be as early as February 2021, ten months from now.

[3]     Memorandum of Attorney General William P. Barr, Memorandum for Direction of Bureau of Prisons, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic*, Mar. 26, 2020, *available at* https://www.justice.gov/file/1262731/download.

## II. Mr. Pena's Current Conditions of Confinement and Health Conditions

### A. Conditions of Confinement at FCI Fort Dix

FCI Fort Dix is the BOP's most heavily populated facility, with over 2,700 inmates.[4] It has a low security facility and a smaller minimum security camp. Since the outbreak of the novel coronavirus, inmates, their families, and advocates have been sounding the alarm about conditions in Fort Dix. On April 20, an inmate reported that a man collapsed during a temperature check.[5] Staff in the facility took nearly fifteen minutes to remove the inmate from his bunk, during which time they sprayed his body and bed with disinfectant.[6] As in other facilities, the prison has cut off visits with family and lawyers, and also has forbidden programs and recreational activities, leading the prisoners to be warehoused indefinitely.[7] Recently, a prisoner at Fort Dix leaked cellphone video that was posted online by a blogger showing what appears to be the yard at the facility in mid-April.[8] As described by the blogger and apparent in the video, conditions are crowded with no social distancing. It does not appear that anyone in the facility is wearing a mask. The inmate also reports that they are being served moldy food.

---

[4] https://www.bop.gov/mobile/about/population_statistics.jsp#bop_pop_table (last accessed Apr. 27, 2020).

[5] Elizabeth Weill-Greenberg, *Coronavirus is ready to explode inside Fort Dix federal prison, incarcerated people and their loved ones say*, The Appeal, Apr. 23, 2020, https://theappeal.org/fort-dix-prison-new-jersey-coronavirus/.

[6] *Id.*

[7] *Id.*

[8] Cassandra Fairbanks, *Exclusive: Leaked Photos and Video From Fort Dix Federal Prison in New Jersey Shows No Social Distancing or Masks, Despite Confirmed Coronavirus Case*, The Gateway Pundit, Apr. 12, 2020, https://www.thegatewaypundit.com/2020/04/exclusive-leaked-photos-video-fort-dix-federal-prison-new-jersey-shows-no-social-distancing-masks-despite-confirmed-coronavirus-case/.

At the time of his report there was one confirmed case of COVID-19 in Fort Dix – there are now at least thirty.[9]

The facility, like many jails and prisons, is an optimal environment for the transmission of contagious disease.[10]  Public health experts are unanimous in their opinion that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," and "infection control is challenging in these settings."[11]  Dr. Brie Williams is a professor of medicine at the University of California, San Francisco, and director of the university's correctional health program.  She has served as a consultant for various prison systems, including California's state correctional system.  In her attached affidavit, Dr. Williams explains that prisons are not actually isolated from the community–they are in regular contact with the broader community through the coming and going of correctional officers and healthcare workers.  Decl. of Dr. Brie Williams, attached hereto as Exhibit D, at ¶ 5.  Access to COVID-19 testing for such employees has been "extremely limited" and screening for symptoms among correctional officers has not been consistently applied.  *Id.*  The close quarters of prison facilities create "an extraordinarily high risk of accelerated transmission of COVID-19," as "[e]ffective social distancing . . . is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as lack of hand sanitizer or sufficient opportunities to wash hands."  *Id.* ¶ 7.  Because the capacities of jails and prisons to provide medical care is limited, infection within such facilities will

---

[9]      https://www.bop.gov/coronavirus/ (last accessed Apr. 29, 2020).  The numbers reported by the BOP have fluctuated between 32 and 30 over the last three days.

[10]      Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8): 1047-1055 (2007), available at https://doi.org/10.1086/521910.

[11]      "Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at https://bit.ly/2W9V6oS.

necessarily mean increased admissions to local hospitals, straining their already-limited resources.  *See id.* ¶¶ 17-20. As Dr. Homer Venters, an epidemiologist and former chief medical officer of the NYC Correctional Health Services, has reported, prison conditions are "going to drive the entire epidemic curve for this nation up, just when we're trying to flatten it."[12]

Despite the BOP's so-called "action plan" to contain and mitigate the spread of COVID-19, as of April 28, 2020, at least 1,979 inmates and 475 staff members have been infected, including at least 30 individuals at Fort Dix.[13]  The following chart created by the Federal Defenders shows the rate of BOP-reported positive tests nationwide:[14]



---

[12]      Erin Doherty and Kelly Cannon, *'We Need Help': Inmates Describe Prison System Unprepared for Coronavirus*, ABC News (Apr. 5, 2020), https://abcnews.go.com/Politics/inmates-describe-prison-system-unprepared-coronavirus/story?id=69980790.

[13]      *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 29, 2020).  These total numbers include inmates and staff who are reported as having recovered from COVID-19 and those inmates who have died from the virus.

[14]      *Available at* federaldefendersny.org (last accessed Apr. 25, 2020).

As worrisome as these numbers are, however, the actual number of infections is likely significantly higher than the BOP is reporting given the severe limitations on testing capability.[15] As the warden of the Metropolitan Correctional Center ("MCC")—"[a] federal detention center at the epicenter of the coronavirus pandemic"—told Judge Engelmayer on April 4, "MCC New York does not have COVID-19 tests."[16]  Nevertheless, even based on the BOP's reported cases, the rate of infection in its facilities is approximately three times higher than as a percentage of the general population, as reflected in the following bar graph[17]:



---

15      *See, e.g.*, Sheryl Gay Stolberg, Farah Stockman & Sharon LaFraniere, *Testing Remains Scarce as Governors Weigh Reopening States*, N.Y. Times, Apr. 26, 2020, https://www.nytimes.com/2020/04/25/us/politics/virus-testing-shortages-states-trump.html?action=click&module=Spotlight&pgtype=Homepage.

16      James Hill and Luke Barr, *No COVID-19 Tests Available for Prisoners at Center of New York Outbreak, Court Documents Show*, ABC News (Apr. 4, 2020), https://abcnews.go.com/Health/covid-19-tests-prisoners-center-york-outbreak-court/story?id=69969077; *see also* Frank G. Runyeon, *Prison Says It Tested Just 2 More Inmates Despite Virus Cases*, Law360 (Apr. 1, 2020), https://www.law360.com/newyork/articles/1259489/prison-says-it-tested-just-2-more-inmates-despite-virus-cases.

17      *Available at* https://federaldefendersny.org (last accessed Apr. 29, 2020).

Thirty-one federal inmates have died from the virus thus far.  An inmate in FCI Elkton, where several inmates have already died from the virus, uploaded cellphone footage of the prison, showing "a tent on a basketball court that he claims was set up to store the bodies of men who died from COVID-19."[18]  And it is very likely that in the coming weeks many more will be infected, and more will die.

        B.      <u>Mr. Pena's Particular Health Conditions Make Him Especially Susceptible to COVID-19</u>

Mr. Pena is sixty years old and has several underlying health conditions that increase his vulnerability to COVID-19 infection and, if infected, to the risk of death.  As noted in the attached medical records, Mr. Pena suffers from ███████████████████████.  *See* Medical Records, Ex. B, at 410.  Mr. Pena takes seven medications daily:  ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████.  *Id.* at 373-75.

Mr. Pena's ██████████ presents special concern.  Based on early reports, 40% of hospitalized COVID-19 patients had ███████████████ and data show a 10.5% death rate among people with COVID-19 who also have ██████████.[19]  And recent reports from autopsies of patients who have died of the coronavirus indicate ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

---

[18]      Keegan Hamilton, *Prisoner Uses Smuggled Cellphone to Beg For Help with Coronavirus on Facebook Live*, Vice News (Apr. 5, 2020), <u>https://www.vice.com/en_us/article/z3b9qj/prisoner-uses-smuggled-cellphone-to-beg-for-help-with-coronavirus-on-facebook-live</u>.

[19]      ███████████████████████████████████████████████████████ ██████████

███████████████████████████████████████████████████████████

████████████████████.[20]

Several courts, including this Court, have held that the risk of COVID infection for individuals with ███████████ is of acute concern and cause, among other factors, for finding extraordinary and compelling circumstances warranting compassionate release. *See, e.g.*, *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020); *United States v. Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020); *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020); *Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020).

Moreover, Mr. Pena takes ████████████████████████████

███████████████████████████████████████████████████████████

████████████████.[21]  In fact, two recent decisions in this district have released inmates (albeit pre-sentencing, but post-plea) based on those individuals' taking ███████████, medications in the same class as ██████████. *See Order*, *United States v. Witter*, No. 19-Cr-568 (SHS) (S.D.N.Y. Mar. 26, 2020), ECF No. 40; *Order*, *United States v. Velasquez (Reinaldo Roman)*, No. 19-Cr-

---

[20] ███████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████

[21] ████████████████████████████████████████████████
██████████████████████████
███████████████████████████████████████████████
███████████████████████████████████

116 (KMW) (S.D.N.Y. Mar. 27, 2020), ECF. No. 155).  Like the individuals in these cases,

Mr. Pena faces a "risk of serious infection while in custody as a result of his medical condition,"

*Witter* Order, at 2, due to his regular intake of this medication, ████████████████████████

████████████████

Mr. Pena is powerless to take the preventative self-care measures directed by the CDC

for his high-risk group to remain safe from COVID-19 infection.  He cannot self-quarantine or

partake in "social distancing" in his prison facility.  The high-density areas described above are

precisely the kind of spaces that have caused the alarmingly high-spread rates of COVID-19 in

New York City.[22]  Yet, unlike in New York, the curve in prisons is not flattening.[23]  Indeed in

just the last week, the number of inmates currently testing positive has nearly *tripled* from 566

on April 22 to 1,534 on April 29.  Hand sanitizer, an effective disinfectant recommended by the

CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol

content.[24]  Correctional health experts worry that, despite limited precautions, these facilities

may become incubators for the COVID-19 disease.[25]  In sum, the acute risks that exist at FCI

Fort Dix are especially dangerous to Mr. Pena, and he accordingly faces a period of sustained

peril that is likely to be "grave and enduring."  *Fed. Defenders of N.Y. v. Fed. Bureau of Prisons*,

--- F.3d ---, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

---

[22]     "White House Tells Travelers from New York to Isolate as City Cases Soar," *New York Times* (March 24, 2020), available at https://www.nytimes.com/2020/03/24/nyregion/coronavirus-new-york-update.html.

[23]     *See* Katie Park, Tom Meagher & Weihua Li, *Tracking the Spread of Coronavirus in Prisons*, The Marshall Project, Apr. 24, 2020, https://www.themarshallproject.org/2020/04/24/tracking-the-spread-of-coronavirus-in-prisons (noting that rate of infection has tripled in last week prior to publication of article).

[24]     Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?," *ABA Journal* (March 13, 2020), available at https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[25]     Michael Kaste, "Prisons and Jails Worry About Becoming Coronavirus 'Incubators'," *NPR* (March 13, 2020), available at https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

**III.    Under the First Step Act, this Court Has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Pena's Sentence and Release Him to Home Confinement Now**

Before passage of the First Step Act ("FSA"), 18 U.S.C. § 3582(c)(1)(A)(i) permitted only the BOP to petition the Court for compassionate release.  Dismayed at the low numbers of such petitions, Congress in 2018 amended the statute so as to expressly permit inmates, like Mr. Pena, to petition the Court directly to reduce his term of imprisonment and seek compassionate release.  *See* 18 U.S.C. § 3582(c)(1)(A)(i); *see also* U.S. Dep't of Justice, *The Federal Bureau of Prisons' Compassionate Release Program*, p. 11 (2013); 164 CONG. REC. S7774 (daily ed. Dec. 18, 2018) (noting that FSA's amendment to compassionate release law was Congress' response to the BOP's failure to "properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered").  The statutory scheme still provides the BOP with an opportunity to bring the claim and requires that the inmate first petition the warden for release.  *Id.*  The statute's major revision to prior law, however, is that it also provides that recourse can be sought by the inmate *directly* through the courts after either (1) the BOP declines to file such a motion on an inmate's behalf; or (2) there has been of lapse of thirty days from the warden's receipt of the request, whichever is earlier.  *Id.*; *see also* 164 CONG. REC. S7774 (daily ed. Dec. 18, 2018) (purpose of amendment to "expedite compassionate release applications").

A court may "'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction.' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020).  "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable.""  *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).  The legislative

purpose of § 3582(c) was to create "safety valves for modification of sentences" and Congress

contemplated that the decision of whether "there is justification for reducing a term of

imprisonment" would reside with the sentencing court, given that the traditional body that would

consider such modification – a parole board – has been abolished in the federal system.  S. Rep.

No. 98-225, at 56, 121 (1983).

Prior to passage of the FSA, the Sentencing Commission promulgated policy statement

U.S.S.G. § 1B1.13, application note 1, which enumerates several grounds constituting

extraordinary and compelling reasons for release.  The policy statement includes reasons of

medical illness, age, and family circumstances, but also includes a category for "Other Reasons,"

when there is "an extraordinary and compelling reason other than, or in combination with, the

reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13, cmt 1.  While the

Sentencing Guidelines require that such "other reasons" be found by the director of the BOP, the

majority of district courts reviewing this provision have held that since the FSA, that delegation

of authority to the BOP is no longer valid, and courts may make their own independent

assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in

light of the FSA's amendments.  *See, e.g.*, *United States v. Millan*, No. 91-CR-685 (LAP), 2020

WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020) (discussing courts' "newfound authority" under the

FSA "to reduce sentences based on 'extraordinary and compelling reasons' (even if those

reasons do not relate to [factors enumerated in U.S.S.G. § 1B1.13])"); *United States v. Cantu*,

No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (holding that, given the

changes to the compassionate release statute by the FSA, U.S.S.G. § 1B1.13, application note

1(D) "no longer fits with the statute and thus does not comply with the congressional mandate

that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582").[26]

     A.    <u>The unprecedented nature of this emergency compels the Court to waive the exhaustion requirement</u>

Through counsel, Mr. Pena has provided the BOP with notice of his claim.  On April 21, 2020, the undersigned made a request by email to release Mr. Pena to home confinement pursuant to 18 U.S.C. § 3582(c)(1)(A), or, in the alternative, Attorney General Barr's memorandum of March 26, 2020.  *See* Exhibit C.  After following up with the administrative office at FCI Fort Dix on April 23, 2020 and again on April 27, 2020, the BOP has not acted on Mr. Pena's request.  Although the BOP has yet to act and thirty days have yet to pass, Mr. Pena files this motion now in light of the urgent nature of this matter.

As this Court and many others have recognized, given the extraordinary emergency and immediate threat to Mr. Pena's health, courts need not wait for the entire thirty-day period under the FSA before considering the merits of an application such as this one.  As the Court held in *Scparta*, the exhaustion requirement of section 3582(c)(1)(A) is not jurisdictional, "merely controls who—the BOP or defendant—may move for compassionate release and when such a motion may be made.  2020 WL 1910481, at *4 (quoting *United States v. Haney*, No. 19-cr-541

---

[26]     *See also United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); *United States v. Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect."); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (holding that application note 1(D) is "inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BoP finds they are not appropriate," and courts thus may "consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement"); *but see United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019) (holding that application note 1(D) governs compassionate release reductions of sentence and federal judges have no authority to create their own criteria for what constitutes an "extraordinary and compelling" reason for resentencing).  In other words, based on the clear directive of the statute, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

(JSR), 2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020)).  The statute's requirement is rather a claim-processing rule, and therefore it is "subject to equitable considerations, such as waiver, estoppel or futility." *Id.* at *4 (quoting *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006).  As this Court noted, however, this claim-processing rule is "like no other." *Id.* *6.  Its "distinctive" feature is that it *either* requires administrative exhaustion *or* the lapse of thirty days from an inmate's request. *Id.* (quoting *United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020)).  Thus, the equitable exceptions that traditionally apply to a timeliness requirement, as opposed to a strict administrative exhaustion requirement, apply to the statute. *See id.*  Notably, as this Court held, the Act's twin purposes of increasing safety to the public and prisoners, and to accelerate judicial review of request for compassionate release, are served by treating the exhaustion requirement as excusable. *Id.* at *7. "In sum, the First Step Act's text, history, and structure all counsel in favor of concluding that the statute's exhaustion requirement is amenable to equitable exceptions." *Id.* at *8.

Recent opinions by Judges Liman, Rakoff, Keenan, Ross, and Torres are in accord with this Court's conclusion that the FSA's exhaustion provision is non-jurisdictional, subject to waiver, and properly waived in light of the exigencies created by the COVID–19 pandemic. *See Russo*, 2020 WL 1862294, at *3-7 (Liman, J.) (analyzing exhaustion issue; concluding that court "can grant the requested relief on its own authority, given the extraordinary circumstances here, and because doing so would not be inconsistent with congressional intent"); *Haney*, 2020 WL 1821988, at *1-4 (Rakoff, J.) (same; concluding that "Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually favors such waiver, allowing courts to deal with the emergency before it is potentially too late"); *Smith*, 2020 WL 1849748, at *2-4 (Keenan, J.) (same; concluding that "the First Step Act did not empower the Government with the sole authority to decide when and under what

conditions exhaustion may be waived," and "agree[ing] . . . that "judicial waiver is permissible in light of the extraordinary threat certain inmates face from COVID–19"); *Sawicz*, 2020 WL 1815851, at *2 (Ross, J.) (same; concluding that "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension, justifies waiver," because the "delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences"); *Zukerman*, 2020 WL 1659880, at *4 (Torres, J.) (same, and concluding that risk associated with hypertension, among other ailments, justifies compassionate release). *See also, e.g.*, *United States v. Livingston*, 2020 WL 1905202, at *1–2 (E.D.N.Y. Apr. 17, 2020) (ENV); *United States v. McCarthy*, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020); *United States v. Colvin*, No. 3:19cr179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020).

Thus, as this Court had previously held, section 3582(c)(1)(A)'s exhaustion requirement may be waived.  The Court should waive the requirement with respect to Mr. Pena.  It hardly serves the Congressional purpose of the FSA to force Mr. Pena to wait an additional twenty-one days to have his claim adjudicated.  "[E]ach day [Mr. Pena] must wait before presenting what could otherwise be a meritorious petition threatens him with a greater risk of infection and worse." *Haney*, 2020 WL 1821988, at *4.  The "delay" that Mr. Pena would experience if he had to wait three weeks for this Court to decide his motion "would put him at significant risk of suffering catastrophic health consequences." *Sawicz*, 2020 WL 1815851, at *2.  And it would not advance the purpose of providing the BOP's expert guidance on whether Mr. Pena is eligible for compassionate release.  Indeed, the BOP already has provided its input on such requests:  it has known about the potential impact of COVID-19 since January – far more than thirty days – but

its "COVID-19 Action Plan" lacks any consideration of compassionate release.[27]  FCI Fort Dix

remains ill-prepared despite the ample notice, and already has had over thirty cases of COVID-

19 infection, with likely additional cases untested or unreported.  Thus, it would be futile to force

Mr. Pena to exhaust his administrative remedies — at the cost of his health and, potentially, his

life.  *See United States v. Basciano*, 369 F. Supp. 2d 344, 349 (E.D.N.Y. 2005) (despite failure to

exhaust administrative remedies, because "the BOP ha[d] not addressed [his] request for relief in

a timely fashion," despite "ample opportunity" to do so, the court found that "[t]he

administrative appeals process would thus, in the circumstances of this case, be an empty

formality that would risk exposing Basciano to irreparable harm").

There is, in addition, a high risk of irreparable injury if the Court were to wait to

adjudicate Mr. Pena's petition.  Within the BOP, the rate of infection, despite the failure to test

properly, has risen exponentially: just over one month ago, on March 25, there were six

confirmed cases among inmates and staff; now there are 2,4,23, including individuals who have

tested positive and purportedly recovered.  The number of infected inmates has nearly tripled in

the last week.  Thirty-one inmates have died.  Mr. Pena should not be forced to bear the

potentially fatal consequences of the facility's failure to adequately prepare for COVID-19.  In

these extraordinary circumstances, this Court should review the merits of Mr. Pena's emergency

motion for compassionate release and waive the exhaustion requirement under 18 U.S.C.

§ 3582(c)(1)(A)(i).

---

[27]     *See* Fed. Bureau of Prisons Covid-19 Action Plan (Mar. 13, 2020),
https://www.bop.gov/resources/news/20200313_covid-19.jsp.

B.     <u>"Extraordinary and compelling reasons" warrant a reduction of Mr. Pena's sentence</u>

On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic.[28]  New York has been labeled the new "epicenter" of the pandemic worldwide.[29]  The tri-state area's cases of COVID-19 now represent more than 40% of the cases in the United States.[30]  New Jersey, where Fort Dix is located, has over 100,000 cases and over 6,000 deaths.[31]

COVID-19 is already sweeping through local jails and prisons, too.  In just twelve days, the number of cases at Rikers Island went from one to nearly 200, prompting the top physician for the facility to call it "a public health disaster unfolding before our eyes."[32]  Other New York City jails have also had positive tests for COVID-19, prompting city officials to release substantial numbers of inmates to reduce overcrowding and slow the spread of the virus.[33]  Federal facilities are not immune: the BOP has confirmed 1,979 inmates and 475 staff have been infected with the disease.[34]  The numbers are likely higher, as testing is limited.  *See, e.g.*, *In the*

---

[28]     "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at https://bit.ly/2W8dwpS.

[29]     New York Becomes 'Epicenter' of Coronavirus Pandemic, *Politico New York Health Care* (March 25, 2020), https://www.politico.com/states/new-york/newsletters/politico-new-york-health-care/2020/03/25/new-york-becomes-epicenter-of-coronavirus-pandemic-333669.

[30]     https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last accessed Apr. 28, 2020).

[31]     *Id.*

[32]     Miranda Bryant, *Coronavirus spread at Rikers is a 'public health disaster,' says jail's top doctor*, The Guardian, Apr. 1, 2020, https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster.

[33]     Sydney Periera, *Confirmed Coronavirus Cases Rise in New York Jails, Increasing Pressure to Release People in Custody*, *available at* https://gothamist.com/news/confirmed-coronavirus-cases-rise-nyc-jails-increasing-pressure-release-people-custody.

[34]     https://www.bop.gov/coronavirus/ (last accessed Apr. 29, 2020).

*Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested"). For example, officials at the MDC in Brooklyn have admitted that they have only administered tests to three inmates total, even though there is a known infection inside the facility.[35] Thirty-one inmates have died in custody in the last month.[36]

　　　　With the tristate area as the epicenter of the epidemic, it is no surprise that the virus has already entered prison facilities in the region, including FCI Fort Dix. The BOP website is currently reporting twenty-seven inmates and three staff members at Fort Dix have tested positive. These numbers have come down in the last two days, apparently due to inmates who had the virus and have recovered. These numbers are almost certainly an undercount based on available testing. Moreover, reports from inside the prison, cited above, suggest the facility is ill-equipped to handle the outbreak occurring within its walls. Despite the BOP's supposed months of planning for COVID-19, its actual response has been a patchwork of ineffectual efforts, leading tragically (but unsurprisingly) to an explosion of cases that is multiplying at a rate dramatically higher than in the general population.

　　　　Mr. Pena is especially vulnerable in these already extreme circumstances. His ██████████████████████████ put him at high risk of infection and increase the likelihood of hospitalization and death if he is infected. A CDC study of hospitalization rates and characteristics of patients diagnosed with COVID-19 in March found that ████████ █████

---

[35]　　*See* note 16, *supra.*

[36]　　Melena Ryzik & Nancy Coleman, *As Tekashi69 Is Released, Inmates Fearing Coronavirus Ask, 'Why Not Me?'* N.Y. Times, Apr. 2, 2020, https://www.nytimes.com/2020/04/02/arts/music/tekashi69-free-prison-coronavirus.html?action=click&module=Latest&pgtype=Homepage; *see also* https://www.bop.gov/resources/press_releases.jsp.

███████████████████████████████████████████████████[37] And recent

reports from hospitals show ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████. Finally, Mr. Pena's age – sixty-years-old – while not in the highest-

risk category, also increases his vulnerability to the virus, especially in combination with these

other risk factors. *See also* Ex. D ¶ 12 (describing research showing physiological age of

prisoners is often substantially higher than their chronological age based on stresses and health

risks associated with incarceration).

Numerous courts, including this Court, have relied on many of these precise medical

conditions to grant § 3582(c)(1)(A)(i) motions. *E.g.*, *United States v. Bess*, 2020 WL 1940809

(W.D.N.Y. Apr. 22, 2020) (64 years old; multiple conditions, including ███████████████

██████████████); *Scparta*, 2020 WL 1910481 (multiple conditions, including ████████████);

*Atwi*, 2020 WL 1910152 (██████████████); *United States v. Joling*, 2020 WL 1903280 (D. Or.

Apr. 17, 2020) (multiple conditions, including ████████████████████); *Samy v. United

States*, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) (72 years old; multiple conditions,

████████████████████); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020)

(multiple conditions, ████████████████); *United States v. Burrill*, 2020 WL 1846788 (N.D.

Cal. Apr. 10, 2020) (multiple conditions, ██████████████████); *Sawicz*, 2020 WL 1815851

(██████████); *Miller v. United States*, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020) (69 years

old; multiple conditions, including ██████████████████████████████); 

*Zukerman*, 2020 WL 1659880 (multiple conditions, ██████████████████); *Colvin*, 2020 WL

---

[37] Garg S, et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019—COVID-NET, 14 States, March 1-30, 2020*, MMWR Morb. Moral Wkly Rep. 2020:59:458-464, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm#suggestedcitation.

1613943 (same); *United States v. Rodriguez*, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020) (same); *United States v. Muniz*, 2020 WL 1540325 (S.D. Tex. March 30, 2020) (same).

More generally, numerous courts around the country, including in this district, have already found that the high risk to vulnerable defendants, like Mr. Pena, of infection from COVID-19 – and the likelihood that such infection will be severe – as constituting (or, at a minimum contributing to) "extraordinary and compelling reasons" under U.S.S.G. § 1B1.13's catchall provision.  To cite just a few examples from the Second Circuit not previously cited above:  *United States v. Gileno*, No. 19 Cr. 161 (VAB), 2020 WL 1916773, at *5 (D. Conn. Apr. 20, 2020); *United States v. Razzouk*, No. 11 Cr. 430 (ARR), ECF No. 136 (E.D.N.Y. Apr. 19, 2020); *United States v. Asaro*, No. 17 Cr. 127 (ARR), ECF No. 176 (E.D.N.Y. Apr. 17, 2020); *United States v. Kataev*, No. 16 Cr. 763 (LGS), ECF No. No. 779 (S.D.N.Y. Apr. 15, 2020); *United States v. Smith*, No. 12 Cr. 133 (JFK), ECF No. 197 (S.D.N.Y. Apr. 13, 2020); *United States v. Knox*, No. 15 Cr. 445 (PAE), ECF No. No. 1088 (S.D.N.Y. Apr. 10, 2020); *United States v. Santiago*, No. 12 Cr. 732 (WHP), ECF No. No. 235 (S.D.N.Y. Apr. 10, 2020); *United States v. Henao*, No. 10 Cr. 231 (ENV), ECF No. 93 (E.D.N.Y. Apr. 10, 2020); *United States v. Almonte*, No. 05 Cr. 58 (SRU), 2020 WL 1812713 (D. Conn. Apr. 9, 2020); *United States v. Hansen*, No. 07 Cr. 520 (KAM), 2020 WL 1703672, at *7 (E.D.N.Y. Apr. 8, 2020); *United States v. Chunn*, No. 16 Cr. 388 (BMC), ECF No. 32 (E.D.N.Y. Apr. 8, 2020); *United States v. McBride*, No. 15 Cr. 876 (DLC), ECF No. No. 73, (S.D.N.Y. Apr. 7, 2020); *United States v. Jasper*, No. 18 Cr. 390 (PAE), ECF No. No. 441 (S.D.N.Y. Apr. 6, 2020); *United States v. Harris*, No. 18 Cr. 364 (PGG), ECF No. 413 (S.D.N.Y. Apr. 6, 2020); *United States v. Gentille*, No. 19 Cr. 590 (KPF) (S.D.N.Y. Apr. 9, 2020); *United States v. Jackson*, No. 15 Cr. 135 (ENV), ECF No. No. 208 (E.D.N.Y. Apr. 6, 2020); *United States v. Resnick*, No. 12 Cr. 152 (CM), ECF No. No. 461 (S.D.N.Y. Apr. 2, 2020); *United States v. Perez*, No. 17 Cr. 513 (AT), ECF Docket

No. 98, (S.D.N.Y. Apr. 1, 2020); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC), ECF

Docket No. 1325-1326 (E.D.N.Y. Mar. 30, 2020); *United States v. Campagna*, No. 16 Cr. 78

(LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020).  These decisions have recognized

that home confinement is "significantly better" than custody "where despite the BOP's best

efforts, [an inmate] is constantly at risk from contamination both from within and without the

prison walls, and where access to [personal protective equipment] for inmates is essentially non-

existent."  *Resnick*, at 14.

 For all of these reasons, and particularly the acute risk to his health posed by COVID-19

– as aggravated by the prison environment – this Court should find that "extraordinary and

compelling reasons" warrant compassionate release.

   C. <u>The 3553(a) factors weigh in favor of release to home confinement</u>

 When extraordinary and compelling reasons are established, the Court must consider the

relevant sentencing factors in section 3553(a) to determine whether a sentencing reduction is

warranted. 18 U.S.C. § 3582(c)(1)(A)(i).  While these were factors previously considered by the

Court at the original sentencing, how those factors should be balanced undeniably has changed.

 In this case, a review of the section 3553(a) factors, and Mr. Pena's release plan of home

confinement under electronic monitoring[38] for the remainder of his unserved original term of

imprisonment, favor granting compassionate release.

 As an initial matter, we recognize that while this case bears similarities to *Scparta* and

*Gross*, No. 15-cr-769 (AJN), the nature of the crime is different from those cases.  We fully

acknowledge that the robbery in this case was violent, terrifying to its victims, and a serious

---

[38] On April 3, 2020, Attorney General Barr issued an additional memo urging the BOP to release eligible
individuals to home confinement as expeditiously as possible, even if electronic monitoring equipment is
unavailable.  Memorandum of Attorney General William P. Barr, *Increasing Use of Home Confinement at
Institutions Most Affected by COVID-19*, Apr. 3, 2020, available at https://www.justice.gov/file/1266661/download.
It is our understanding that, at this time, U.S. Pretrial Services has location monitoring technology available.

crime meriting the significant sentence that the Court imposed in 2017. However, the mitigating

factors in this case are also compelling and quite unique: Mr. Pena was essentially a first-time

offender in his fifties, having led a law-abiding life and contributed meaningfully to his

community for decades.[39] The offense conduct in this case, which was a radical departure from

Mr. Pena's generally good character, was the likely result of a toxic stew of ███████████

███████████████████████, stemming from the sudden and tragic death of his son, and the

influence of an individual named Chamoro, whom Mr. Pena had met at a gambling establishment

and who planned the robbery with him, recruiting and directing the men who committed it. Mr.

Pena fully admitted responsibility for his role in organizing the robbery, but as became clear

between the plea and sentencing – during which the Court ordered a competency hearing – Mr.

Pena's mental and psychological health was severely compromised without the aid of medication

to treat his ████████████████. He was in this state at the time of the offense conduct, and

his condition was exacerbated at the time by █████████████████████████.

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████. Mr. Pena's mental health

has dramatically improved and both he and his family report to the undersigned that Mr. Pena is

lucid, stable, and optimistic about his future. He has also completed drug and alcohol

rehabilitation programming at FCI Fort Dix, despite the fact that he is likely barred from early

---

[39] As noted in the PSR, Mr. Pena had two minor convictions in the 1980s and one trespass case from 2007 in which he was found in possession of cocaine. None of these convictions resulted in any jail time, and as the Court stated at sentencing, the conduct here was a significant break from Mr. Pena's otherwise nonviolent and productive life. Sentencing Tr. at 45:13-14

release through the RDAP program due to the nature of his crime.  Mr. Pena's participation in

such programming reflects rather a genuine commitment to improving his health and ensuring

that he is successful when he returns to society.  *See Millan*, 2020 WL 1674058 at *9 (noting that

inmate's "educational and rehabilitative accomplishments are unique and distinctively important

because he engaged in all such positive activities without any tangible incentive other than self-

improvement").  Besides attending to his psychological health, Mr. Pena has spent his time in

prison working in food services and recommitting himself to his faith.  As noted in his

disciplinary record, Ex. A, he has not incurred a single infraction since his incarceration began in

March of 2016.  In short, Mr. Pena is a far healthier person mentally than appeared before Your

Honor several years ago and he has used his time in custody productively.

We acknowledge that Court's original sentencing decision carefully weighed the

mitigating circumstances unique to Mr. Pena against the serious nature of the offense, and

imposed a substantial variance below the Guidelines that appropriately reflected that careful

balancing.  But the calculus on those factors has changed with the COVID-19 pandemic.  The

deterrent effect of the virus itself is now a powerful motivator for Mr. Pena never to see another

federal courtroom as a defendant.  Further, the Court's previous serious sentence was a powerful

statement of the need for respect for the law – and already achieved the necessary measure of

general and specific deterrence.  Yet, the Court never intended for that sentence to carry an

unreasonable threat of death.  *See United States v. Hernandez*, No. 18 Cr. 834 (PAE) (S.D.N.Y.

Mar. 25, 2020), ECF No. 440 ("Had the Court known that sentencing Mr. Hernandez to serve the

final four months of his term in a federal prison would have exposed him to a heightened health

risk, the Court would have directed that these four months be served instead in home

confinement.").  While conceding that Mr. Pena's offense conduct was extremely serious and

that he still has approximately sixteen months of incarceration unserved from his original

sentence, the circumstances—since this sentence was initially imposed by this Court—have certainly changed. *See Zukerman*, *supra*, at 11 ("The severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence.").

Further, Mr. Pena has served 2/3 of his sentence. With good time – to which he is entitled given his unblemished record in custody – he is slated to be released in February 2022. However, Mr. Pena's release to the community will likely occur six months earlier than that, in August 2021, sixteen months from now. Effectively, granting Mr. Pena's petition will mean that he serves 19% of his original sentence on home confinement beyond any period that would otherwise be authorized by the BOP.

Mr. Pena has shown that he is capable of adjusting to home confinement. A magistrate judge previously found that Mr. Pena is not a danger to the community in granting him bail at the outset of the case, despite the seriousness of the charges. Mr. Pena had no trouble complying with the requirements of home detention and electronic monitoring. This Court recognized that Mr. Pena posed no danger again when it continued bail and subsequently permitted him to surrender a week after his plea to Hobbs Act robbery, despite the nature of the charge to which he had pleaded guilty. Finally, the Court acknowledged at sentencing that Mr. Pena's age, lack of criminal history, and strong ties to his family and the community indicated "a very decreased likelihood of recidivism going forward." Sentencing Tr. at 45:18-19.

Finally, Mr. Pena's family has a comprehensive release plan that will ensure his successful reintegration into the community as well as the health and safety of both him and those around him. As described in the attached letter from his wife, Maria Pena, Exhibit E, the family recently purchased a home in Mount Vernon, New York, which is co-owned by Mr. Pena's wife and her sister. The house is much more spacious than the family's previous

two-bedroom apartment in the Bronx, and has a finished basement that contains a bedroom and its own bathroom.  If released, Mr. Pena's 26-year-old son would pick him up from FCI Fort Dix with personal protective equipment ("PPE").  Mr. Pena would then be able to quarantine from the rest of the family for a period of fourteen days in the basement room before moving back in with his family.  Mr. Pena's wife maintains stable employment with the Department of Education, his son and other family members are also employed, and once the crisis passes, Mr. Pena would be able to resume his work as a for-hire driver.

Based on all of the foregoing and the unique circumstances of this case, we respectfully submit that compassionate release is an appropriate exercise of this Court's discretion pursuant to the First Step Act and 18 U.S.C. § 3553(a).

### IV.  Should the Court Deny Compassionate Release, the Court Should Issue a Judicial Recommendation That the BOP Re-Designate Mr. Pena's Sentence to Be Served on Home Confinement

In the alternative, should the Court deny Mr. Pena's request for compassionate release, he respectfully requests that the Court recommend to the BOP that he be designated to serve his sentence under home confinement.

Section 3621 of Title 18 directs that the BOP "shall designate the place of the prisoner's imprisonment . . . subject to, [among other factors,] recommendations of the sentencing court." 18 U.S.C § 3621(b).  The sentencing court continues to "ha[ve] discretion to make recommendations regarding an inmate's placement post-sentencing," *United States v. Shields*, No. 12-CR-410, 2018 WL 2728905, at *2 (N.D. Cal. June 7, 2018); *see also United States v. Bryant*, No. 12-CR-60175, 2020 WL 1149715, at *2 (S.D. Fla. Mar. 10, 2020) (stating that 18 U.S.C. § 3621(b) "contains no temporal restriction" and "requir[es] the BOP to consider *any* statement by the court that imposed the sentence"); *United States v. Best*, No. 5:16-CR-236, 2019 WL 5608856, at *1 (E.D.N.C. Oct. 30, 2019) ("The court has authority to issue a post-judgment

recommendation to the BOP for placement in community confinement.") (collecting cases).

Under the recently-enacted CARES Act, "[d]uring the covered emergency period, if the Attorney

General finds that emergency conditions will materially affect the functioning of the Bureau, the

Director of the Bureau may lengthen the maximum amount of time for which the Director is

authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2)

of title 18, United States Code, as the Director determines appropriate."  P.L. 116-136, March 27,

2020, 134 Stat 281, 516.

      Therefore, Mr. Pena requests that the Court recommend that the BOP—which has "the

latitude to mitigate health risk including by . . . act[ing] with acute sensitivity to [Mr. Pena's]

health and safety"—release him to serve a portion of his sentence in home confinement until the

COVID-19 crisis passes or the sentence is complete, whichever is earlier.  *United States v.

Credidio*, No. 19-CR-111 (PAE), 2020 WL 1644010, at *3 (S.D.N.Y. Apr. 2, 2020); *see, e.g.*,

*United States v. Collins*, No. 2:15-CR-176, 2018 WL 1157508, at *2 (E.D. Cal. Mar. 5, 2018)

(granting defendant's motion for judicial recommendation and recommending "that BOP place

Defendant in an appropriate pre-release placement for the maximum time for which she is

eligible"); *United States v. Ahmed*, No. 1:07-CR-647, 2017 WL 5166427, at *3 (N.D. Ohio Nov.

8, 2017) (granting defendant's motion for judicial recommendation "and recommend[ing] that

the Bureau of Prisons promptly end his prison confinement and transfer him to a Residential

Reentry Center to begin the process of reentry into his home community").

      The requested recommendation would be consistent with the recent directives issued by

Attorney General William Barr.  On March 26, 2020, Attorney General Barr issued guidance to

the BOP directing it to "prioritize the use of your various statutory authorities to grant home

confinement for inmates seeking transfer in connection with the ongoing COVID-19

pandemic."[40]   The memo noted that "for some eligible inmates, home confinement might be more effective in protecting their health" than continued confinement.[41]   The memo set forth the following factors for the BOP to consider in determining whether an individual should be eligible for home confinement (which we provide with their application to Mr. Pena):

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

As discussed above, Mr. Pena is sixty years old and suffers from medical conditions that make him especially high-risk for infection of COVID-19 based on the CDC guidelines.

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and medium security facilities;

Mr. Pena is housed at FCI Fort Dix, a low security facility.

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receive priority treatment;

Mr. Pena has an unblemished record during his incarceration.

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment;

Based on the information available to us, we believe Mr. Pena's PATTERN score to be zero, which puts him in the minimum score category.  *See* U.S. Dep't of Justice, *The First Step Act of 2018: Risk and Needs Assessment System – UPDATE*, Jan. 2020.[42]

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions

---

[40]    *Supra*, note 3.

[41]    *Id.*

[42]    Available at https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.  We have calculated Mr. Pena's PATTERN score as follows:  Mr. Pena receives zero points because he is over age 60; he has no disciplinary infractions, so zero points are added;  he has completed more than three programs while incarcerated, so three points are subtracted; he has engaged in work programing while incarcerated, so an additional point is subtracted; the has completed drug treatment while incarcerated, so another point is subtracted; the instant offense was violent so five points are added; zero points are added for criminal history; and zero points are added for high school or GED completion; yielding a total of zero.

under which the inmate would be confined upon release would present a lower risk of
contracting COVID-19 than the inmate would face in his or her BOP facility;

Mr. Pena has a safe and confirmed release plan.  As described above, if released, Mr.

Pena would reside with his family in Mount Vernon, New York, in a house where he would be

able to self-isolate to the extent necessary for a period of fourteen days.

- The inmate's crime of conviction, and assessment of the danger posed by the inmate
  to the community.  Some offenses, such as sex offenses, will render an inmate
  ineligible for home detention.  Other serious offenses should weigh more heavily
  against consideration for home detention.

Again, as noted above, while we certainly do not minimize the seriousness of Mr. Pena's

crime, as this Court found, Mr. Pena is unlikely to recidivate and was not a danger to the

community such that pretrial detention was necessary.  Similarly now, he does not pose a danger

and thus, despite his crime of conviction, he should be a worthy candidate for home confinement.

In short, the BOP has statutory authority to re-designate Mr. Pena now, and doing so

would be consistent with the directives of the Attorney General.  On April 3, 2020, Attorney

General Barr issued a second memorandum, in which he underscored the urgency of the

situation:  "Given the speed with which this disease has spread through the general public, it is

clear that time is of the essence."[43]  Accordingly, while we are unaware of any statutory authority

for the Court to direct the BOP to act pursuant to the Attorney General's guidance, to the extent

the Court is not inclined to grant compassionate release, it should issue a recommendation that

Mr. Pena be designated to serve a portion of his sentence on home confinement.  Doing so would

protect Mr. Pena's life and serve the public interest.

---

[43]     *Supra,* note 38.

## **<u>CONCLUSION</u>**

For the foregoing reasons, we respectfully request that the Court grant Mr. Pena's request for compassionate release, or, in the alternative, recommend that the BOP re-designate him to serve the portion of his sentence that coincides with the COVID-19 crisis on home confinement.

Dated: April 30, 2020
      New York, New York

                      SHER TREMONTE LLP

                By: <u>/s/Michael Tremonte</u>
                      Michael Tremonte
                      Noam Biale
                      90 Broad Street, 23rd Floor
                      New York, NY 10004
                      T: (212) 202-2600
                      F: (212) 202-4156
                      Email: mtremonte@shertremonte.com