```
                                                    ┌─────────────────────────────┐
                                                    │ USDC SDNY                   │
                                                    │ DOCUMENT                    │
                                                    │ ELECTRONICALLY FILED        │
                                                    │ DOC #:_____       │
                                                    │ DATE FILED:  5/8/20         │
                                                    └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

United States

              –v–

Alberto Pena,

                Defendant.

---

15-cr-551 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Alberto Pena is currently incarcerated at FCI Fort Dix in New Jersey, which is the site of a significant COVID-19 outbreak. He has served approximately two-thirds of his 84-month sentence and is eligible for release within one year. Mr. Pena suffers from a number of serious medical issues that put him at high risk of severe medical consequences were he to contract the virus. As a result, he has filed an administrative request with the Bureau of Prisons and an emergency motion for compassionate release, pursuant to 18 U.S.C. § 3582(c), with this Court. For the reasons that follow, Mr. Pena's motion for compassionate release is GRANTED, and the Government is ordered to release Mr. Pena from custody immediately.

## I.     BACKGROUND

### A.  Underlying Criminal Charges and Proceedings

In August 2015, the Government charged Mr. Pena in a multi-defendant, two-count indictment, alleging that he helped orchestrate a violent armed robbery that terrorized multiple victims, including children. Dkt. No. 1. Mr. Pena was not one of the robbers; he did not physically participate in the robbery. Instead, Mr. Pena's role was as "an organizer." Sentencing. Tr., Dkt. No. 273, at 44. That is not to minimize his importance in the robbery; as the Court noted at sentencing, without Mr. Pena, "[the robbery] would not have occurred." *Id.*

1

(also describing Mr. Pena as a "but-for cause" of the robbery).  In addition, Mr. Pena knew five

people would participate in the robbery, knew or should have known about the existence of

weapons, and knew that there were young children in the home.  *Id.*; *see also* Change of Plea Tr.,

Dkt. No. 173, at 21 (Mr. Pena: "I knew that the other person would threaten to use force to take

the property of the people in the house.").

Following his indictment, the Magistrate Judge determined that incarcerating Mr. Pena

was not necessary to secure the safety of the community, so he was released on bail pending

trial.  *See* Minute Entries dated August 18, 2015.  In February 2016, Mr. Pena pleaded guilty to

committing Hobbs Act robbery.  Over one year later, in April 2017, Mr. Pena appeared before

the Court for sentencing.  The Court determined that the Sentencing Guidelines Range applicable

to Mr. Pena's conduct was 151 to 188 months' (about twelve to sixteen years') imprisonment.

Sentencing Tr. at 24.  Two of the robbery's victims spoke at Mr. Pena's sentencing.  Each

testified that the robbery was deeply traumatic for them and their families, and that the violent

incident had caused irreversible pain and suffering.  *See* Sentencing Tr. at 40–41.  The Court

sentenced Mr. Pena to 84 months' imprisonment to be followed by three years of supervised

release.  Sentencing Tr. at 46–47; Dkt. No. 276 (Judgment).  The substantial downward variance

was a result of the Court's assessment that despite the violent nature of this offense, the

Defendant was not likely to recidivate.  *See* Sentencing Tr. at 45 (the Court concluding that Mr.

Pena's limited criminal history, involvement in his community, charitable acts, and substantial

ties to his family "all speak to his character and, importantly, I think, a very decreased likelihood

of recidivism going forward.").

**B.  Mr. Pena's Motion for Compassionate Release**

Mr. Pena is currently serving his sentence at FCI Fort Dix in New Jersey.  He is

scheduled for release in February 2022, although the Bureau of Prisons has authority to transfer

him to home confinement as early as August 2021.  *See* Pena Br., Dkt. No. 332, at 5.  On April

30, 2020, Mr. Pena filed an emergency motion for compassionate release.  Dkt. No. 332.  About

one week before, Mr. Pena had submitted a similar request to the warden of his prison.  Dkt. No.

332, Ex. C.  Mr. Pena seeks compassionate release because his age and underlying health

conditions make him highly vulnerable to COVID-19.  The Government opposes Mr. Pena's

motion.  *See* Gov't Br., Dkt. No. 334, at 1.

## II.     MR. PENA IS ENTITLED TO COMPASSIONATE RELEASE

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment

once it has been imposed,' 18 U.S.C. § 3582(c); but the rule of finality is subject to a few narrow

exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  The compassionate-release

statute creates one such exception: It allows a court to "reduce" a term of imprisonment, after

considering the factors set forth in 18 U.S.C. § 3553(a), if "it finds that . . . extraordinary and

compelling reasons warrant such a reduction . . . and that such a reduction is consistent with

applicable policy statements issued by the Sentencing Commission."  18 U.S.C.

§ 3582(c)(1)(A)(i).  Under the recently enacted First Step Act, defendants serving their sentence

may move the Court for compassionate release.  *Gotti*, 2020 WL 497897, at \*2; *United States v.

Gross*, No. 15-CR-769 (AJN), 2020 WL 1673244, at \*2 (S.D.N.Y. Apr. 6, 2020).  Mr. Pena has

filed such a motion.

### A.  The Court Excuses Mr. Pena's Failure to Exhaust

Before a compassionate-release motion can be considered on the merits, the defendant

must exhaust administrative remedies.  The First Step Act provides that courts can consider

compassionate-release motions brought by incarcerated defendants only if one of two

requirements is met.  First, courts can consider such motions "after the defendant has fully

exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." 18 U.S.C. § 3582(c)(1)(A). Second, courts can consider such motions after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." *Id.* The earlier of these two dates controls; as soon as one of these requirements is met, the exhaustion requirement is satisfied. *Id.*

Here, the parties agree that neither requirement is met. Mr. Pena initiated the Bureau of Prisons' administrative process nine days before filing his motion in this Court. On April 21, 2020, he requested that the warden of his facility file a compassionate-release motion on his behalf. Dkt. No. 332, Ex. C. This is the first step in the BOP's administrative process. *See generally* 28 C.F.R. § 571.63 (outlining this procedure). The warden has yet to rule on Mr. Pena's request, so he has not "fully exhausted all administrative rights." 18 U.S.C. § 3582(c)(1)(A). And 30 days have not elapsed since he made the request. So Mr. Pena has not exhausted his remedies.

However, Mr. Pena urges the Court to waive compliance with the exhaustion requirement. As the Court discussed at length in its recent decision in *United States v. Scparta*, the First Step Act's exhaustion requirement is not jurisdictional, but instead a claims-processing rule. A defendant's lack of compliance therefore does not strip the Court of power to grant compassionate release. No. 18-CR-578 (AJN), 2020 WL 1910481, at *4 (S.D.N.Y. Apr. 20, 2020). The Second Circuit has also held that such requirements generally admit of equitable exceptions, such as waiver, estoppel, and futility. *Id.* at *5; *see Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006). To determine whether a claims-processing rule is subject to such exceptions, courts look to statutory text and history. *See McCarthy v. Madigan*,

503 U.S. 140, 144 (1992); *see, e.g.*, *United States v. Russo*, No. 16-cr-141 (LJL), 2020 WL 1862294, at \*6 (S.D.N.Y. Apr. 14, 2020).

The First Step Act's plain text creates "an exhaustion requirement like no other of which the Court is aware," in that it contains elements of both a traditional exhaustion scheme and a timeliness requirement. *Scparta*, 2020 WL 1910481, at \*6; *see also Russo*, 2020 WL 1862294, at \*6. The Supreme Court and Second Circuit have often applied equitable exceptions to otherwise unforgiving time requirements, strongly supporting the conclusion that they apply here too. *See, e.g.*, *Holland v. Florida*, 560 U.S. 631, 649 (2010) (applying equitable exception even though text did not permit such an exception); *Paese*, 449 F.3d at 443. Moreover, the Court also considers the exhaustion provision's statutory title, "Increasing the Use and Transparency of Compassionate Release." Pub. L. No. 115-391, 132 Stat. 5339 (2018). Without the application of equitable exceptions, prisoners bringing compassionate-release motions due to COVID-19 might *never* obtain timely judicial review before the virus takes its toll. Such an interpretation, therefore, would serve neither of the provision's stated aims. Finally, the statute's legislative history, which the Supreme Court has described as "paramount" to this inquiry, makes clear that "Congress specifically designed the First Step Act to result in expeditious review of prisoner applications and to improve the health and safety of inmates, prison staff, and the community." *Scparta*, 2020 WL 1910481, at \*7 (citing *McCarthy*, 503 U.S. at 144, and H.R. Rep. 115-699 at 22.) Leaving Mr. Pena in administrative limbo while his life is at risk would be contrary to Congress's express purpose.

In sum, the First Step Act's text, history, and structure all support the Court's conclusion that the statute's exhaustion requirement is amenable to equitable exceptions. And here, waiting for Mr. Pena to exhaust his remedies would both be futile and cause him irreparable harm. FCI

Fort Dix, the complex at which Mr. Pena is currently held, is the most heavily populated BOP

facility and has had 43 confirmed cases of COVID-19.  *See* Bureau of Prisons, COVID-19,

https://www.bop.gov/coronavirus/ (last accessed May 6, 2020).  For Mr. Pena to wait an

additional three weeks (until 30 days lapse and the exhaustion requirement is satisfied) could be

the difference between life and death—and if he falls seriously ill or dies, he will have suffered

irreparable harm and his motion seeking release would be futile.  *Accord Perez*, 2020 WL

1546422, at *3 ("Here, even a few weeks' delay carries the risk of catastrophic health

consequences for Perez.  The Court concludes that requiring him to exhaust administrative

remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic,

would result in undue prejudice and render exhaustion of the full BOP administrative process

both futile and inadequate.").  For these reasons, the Court excuses Mr. Pena's failure to exhaust

administrative remedies.

### B.  The Defendant Has Satisfied All Substantive Requirements For Compassionate Release

Given that administrative exhaustion does not bar Mr. Pena's request, the Court now

considers the merits of his motion.  To award Mr. Pena the relief he seeks, the Court must find

that "extraordinary and compelling reasons warrant" compassionate release. 18 U.S.C.

§ 3582(c)(1)(A)(i).  The Court must also consider the factors set forth in 18 U.S.C. § 3553(a).

*Id.* § 3582(c)(1)(A).  And the Court must find that release is consistent with the Sentencing

Commission's policy statements.  *Id.* § 3582(c)(1)(A)(i).

The Court begins with the factors set out in 18 U.S.C. § 3553(a).  Because this Court

sentenced Mr. Pena, the Court is intimately familiar with how these factors apply to his

circumstances.  As the Court noted at Mr. Pena's sentencing, the underlying conduct here was

heinous.  The armed robbery that Mr. Pena helped to organize was violent, traumatized

numerous victims including children, and resulted in the theft of tens of thousands of dollars.

The robbery would not have occurred were it not for Mr. Pena's involvement. *See* Sentencing

Tr. at 44.  Nonetheless, the Court also noted that Mr. Pena pleaded guilty, accepted responsibility

for his conduct in both written submissions and oral statements before the Court, and expressed

genuine remorse for his involvement in the scheme. *Id.* at 45–46.  And the Court noted "that

[Mr. Pena] did not himself physically participate in this conduct . . . [which] suggests some

diminished level of culpability" as compared to his co-defendants. *Id.* at 44.  Moreover, Mr.

Pena had a limited criminal history before the conduct here, and had never before been convicted

of a violent offense. *See* PSR ¶¶ 44–49; *see also* Sentencing Tr. at 36 (noting Mr. Pena's "lack

of any other criminal history or use of violence in the past.").  In other words, "the criminal

conduct [in this case] appears to be a departure from [Mr. Pena's] otherwise nonviolent and

productive life."  Sentencing Tr. at 45.

      The Court's substantial sentence of 84 months reflected the seriousness of Mr. Pena's

offense and these mitigating factors, and was at the time sufficient, but no greater than, necessary

to achieve the purposes of sentencing.  But the Court's analysis is different in current

circumstances.  Due to the COVID-19 pandemic, the "history and characteristics of the

defendant" and the "need . . . to provide the defendant with needed . . . medical care," § 3553(a),

now weigh heavily in favor of Mr. Pena's release, given the health risk that continued

incarceration poses to him.  Mr. Pena is sixty-years old.  He has several underlying health

conditions that increase his vulnerability to COVID-19 infection and, if infected, to the risk of

serious injury or death.  Specifically, Mr. Pena suffers from hypertension and hyperlipdermia,

among other ailments. *See* Dkt. No. 332, Ex. B, at 41 (Mr. Pena's medical records).  The

Centers for Disease Control and Prevention has identified hypertension as a comorbidity that

increases the likelihood of serious risk from COVID-19. *See* Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease, Centers for Disease Control and Prevention, available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html. This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension, like Mr. Pena. *See, e.g.*, *Scparta*, 2020 WL 1910481, at *9; *see also Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (noting that hypertension increases risk of harm from COVID-19, taking "judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality," and citing information from the CDC). Mr. Pena also takes several medications to control his hypertension and reduce his risk of heart attack. He persuasively demonstrates, and the Government does not dispute, that these medications increase his risk from COVID-19. Pena Br. at 11–12, 20–21 (citing data from the CDC).

Mr. Pena has now served more than two-thirds of his sentence, and may be transferred to home confinement in a little more than one year from now. The time he has served in prison has already achieved much of the original sentence's retributive, deterrent, and incapacitative purpose. And Mr. Pena's continued detention now poses him imminent danger of serious injury and death—a circumstance that the Court never considered when imposing its sentence. Having reconsidered the § 3553(a) factors, the Court thus concludes that they entitle Mr. Pena to compassionate release.

The Court next considers whether "extraordinary and compelling reasons warrant such a reduction [in sentence] . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). "Congress

tasked the Sentencing Commission with identifying the circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence." *United States v. Butler*, No. 19-cr-834 (PAE), 2020 WL 1689778, at *1 (S.D.N.Y. Apr. 7, 2020). The applicable policy statement, U.S.S.G. § 1B1.13, outlines four circumstances that constitute "extraordinary and compelling reasons" and thus warrant a sentence reduction.[1] One of these circumstance exists where the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A). The policy statement also requires that the defendant not pose "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

As this Court has explained, the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals. *See, e.g.*, *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020); *Gross*, 2020 WL 1673244, at *3 ("we are not currently living under normal circumstances"); *accord United States v. Nkanga*, No. 18-cr-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020) ("The country faces unprecedented challenges from the novel Coronavirus pandemic. Those detained in jails and prisons face particularly grave danger."). In these exigent circumstances, the 30-day exhaustion period may be far too long—"each day, perhaps each hour, that elapses 'threatens incarcerated defendants with greater peril.'" *Gross*, 2020 WL 1673244, at *3 (quoting *United States v. Russo*, No. 16-cr-441 (LJL), Dkt. No. 54, at 5 (S.D.N.Y. Apr. 3, 2020)). This is true even though, as the

---

[1] U.S.S.G. § 1B1.13(1)(A) references only "a motion of the Director of the Bureau of Prisons" because it has not yet been updated to reflect the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, which allows defendants independently to seek compassionate release relief from federal courts. *Ebbers*, 2020 WL 91399, at **1, 4. The majority of courts have concluded that since passage of the First Step Act, courts may make their own assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction. *See, e.g., United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020) (citing cases).

Government proffers, the Bureau of Prisons has taken significant action to reduce the risk

COVID-19 poses to prisoners.  Gov't Br. at 6–7.  The Court lauds these efforts and urges

continued and increased vigilance.  But even with these new policies, Mr. Pena continues to face

extraordinary danger from COVID-19 so long as he remains in custody.  As discussed, Mr. Pena

suffers from multiple medical issues that make him especially vulnerable to the virus.

 The Court must also consider whether Mr. Pena poses "a danger to the safety of any other

person or to the community."  U.S.S.G. § 1B1.13(2).  To be sure, the crime organized by Mr.

Pena was extremely violent.  However, Mr. Pena did not play a physical role in the robbery.

And at the time of the crime, Mr. Pena was suffering from substance-abuse and severe mental-

health problems, in large part caused by the sudden and untimely death of his son.  *See* PSR

¶¶ 65–70.  The Government does not dispute that for decades before the robbery, Mr. Pena lived

a law-abiding life and contributed meaningfully to his community.  The same is true of Mr.

Pena's conduct since the crime.  Following his arrest, Mr. Pena was released on bail, and he

complied with the requirements of home detention and electronic monitoring.  And while in

custody, Mr. Pena has completed drug and alcohol rehabilitation programming, obtained mental-

health treatment, and received medication to treat his mental-health issues.  *See* Pena Br. 24–25.

He has also spent his time in prison productively, including by working in food services.  *Id.*

Crucially, Mr. Pena has not received a *single* disciplinary infraction while in custody over the

past five years.  *See* Dkt. No. 332, Ex. A (Mr. Pena's disciplinary record).  Indeed, as the

Government recognizes, the Bureau of Prisons has confined Mr. Pena in a low-security facility.

Gov't Br. at 8.   The aberrational nature of his crime, coupled with Mr. Pena's advanced age,

substantial progress in treating his mental-health and substance-abuse problems, and outstanding

record while in custody, convince the Court, which has close familiarity with all relevant facts,

that he does not now pose a danger to the community.

These factors taken together are extraordinary and compelling, and are therefore sufficient to warrant compassionate release. *Accord United States v. Sawics*, No. 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (concluding that, because the defendant suffered from hypertension, he was vulnerable to COVID-19 and thus "the risk of serious illness or death that he faces in prison constitutes an extraordinary and compelling reason militating in favor of his release."). In sum, the Court concludes that Mr. Pena has satisfied all requirements for compassionate release.

## III.   CONCLUSION

For the reasons stated above, the Court GRANTS Mr. Pena's motion for compassionate release. The Court therefore RESENTENCES Mr. Pena to time served plus 36 months of supervised release under the conditions in the original judgment. The mandatory conditions, standard conditions, and special conditions of supervised release from Mr. Pena's original sentence are hereby imposed. The Court also imposes an additional condition of supervised release: Mr. Pena is ordered to serve the remaining portion of his original term of imprisonment, as calculated by the Bureau of Prisons, under home confinement.

The Government is ORDERED to release Mr. Pena from custody immediately. It is FURTHER ORDERED that the parties shall meet and confer and submit a proposed order governing the conditions of Mr. Pena's release, including his period of 14 days of self-isolation, no later than May 9, 2020 at 12:00 P.M.

SO ORDERED.

Dated:  May 8, 2020
          New York, New York

_____
ALISON J. NATHAN
United States District Judge